## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

*MARIOS PANAYIOTOU*

(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)

-against-

*NYC DEPARTMENT
OF EDUCATION*

(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)

AMENDED
**Complaint for Employment
Discrimination**

Case No. 18 CV 6522 AMD –SMG
*(to be filled in by the Clerk's Office)*

Jury Trial: ☒ Yes ☐ No
*(check one)*



R E C E I V E D
SEP 20 2019
PRO SE OFFICE

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name MARIO PANAYIOTO

Street Address 227 DOVER GREEN

City and County STATEN ISLAND

State and Zip Code NY 10312

Telephone Number (347) 446-8780

E-mail Address Panayio87 @ aol.com

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

Defendant No. 1

Name NYC Department of Education

Job or Title
(if known)

Street Address 131 Livingston St. Room 602

City and County Brooklyn NY 11201

State and Zip Code

Telephone Number

E-mail Address
(if known)

Defendant No. 2

Name

Job or Title
(if known)

Street Address

City and County

State and Zip Code  _____

Telephone Number  _____

E-mail Address  _____

(if known)

**C.**  **Place of Employment**

The address at which I sought employment or was employed by the defendant(s)
is:

Name  _PS/IS 384_

Street Address  _242 Cooper Street_

City and County

State and Zip Code  _Brookly NY 11207_

Telephone Number  _(718) 642-4890_

**II.**  **Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that
apply)*:

    ☒    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you
must first obtain a Notice of Right to Sue letter from the Equal
Employment Opportunity Commission.)*

    ☒    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C.
§§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age
Discrimination in Employment Act, you must first file a charge with the
Equal Employment Opportunity Commission.)*

    ☐    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112
to 12117.

*(Note: In order to bring suit in federal district court under the Americans
with Disabilities Act, you must first obtain a Notice of Right to Sue letter
from the Equal Employment Opportunity Commission.)*

☐ Other federal law (specify the federal law):

_____

☐ Relevant state law (specify, if known):

_____

☒ Relevant city or county law (specify, if known):

NYC Human Rights Law

**III.    Statement of Claim**

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes (*check all that apply*):

☐   Failure to hire me.

☒   Termination of my employment.

☒   Failure to promote me.

☐   Failure to accommodate my disability.

☒   Unequal terms and conditions of my employment.

☒   Retaliation.

☐   Other acts (*specify*): _____

(*Note:    Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.*)

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

January 2016 - January 2017

C. I believe that defendant(s) *(check one)*:

☐ is/are still committing these acts against me.

☐ is/are not still committing these acts against me.

D. Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☒ race _____

☐ color _____

☐ gender/sex _____

☐ religion _____

☒ national origin _____

☒ age. My year of birth is _____. *(Give your year of birth only if you are asserting a claim of age discrimination.)*

☐ disability or perceived disability *(specify disability)*

_____

E. The facts of my case are as follows. Attach additional pages if needed.

To whom it May Concern:
My name is Mario Panayictou. I have Been working in the Doe Since 1999. for the most Part as a Substitut teacher. In January 2012 I was hired and appointed as a teacher by PS-IS 384. When my three Year Probation was Completed and started the Process for tenure an unfortunate sequence of events happened. Instead of getting Tenure i was unfairly and unexpectedly discontinued. We went through the Process of having a hearing and The State Division of Human Rights Ruled in Favor of the Doe. I was advised that i Can file this federal lawsuit in hope that Someone will hear my Story. I just need a chance to tell my Story.

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

Please see attached

IV. **Exhaustion of Federal Administrative Remedies**

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

_____

B. The Equal Employment Opportunity Commission *(check one)*:

☐ has not issued a Notice of Right to Sue letter.

☒ issued a Notice of Right to Sue letter, which I received on *(date)*

August 17 2018

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C. Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐ 60 days or more have elapsed.

☐ less than 60 days have elapsed.

V. **Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Reinstate my position as a teacher and having the "PR" label removed from my name. Financial damages as lost wages. lost pension and loss of retroactive pay from 2012 - 2018 due to a new teachers contract. Physical emotional and mental stress for me and my family (parent of a child with a disability) loss of status and reputation all in the amount of $3,000,000.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 9 | 17 , 2019

Signature of Plaintiff

Printed Name of Plaintiff    MARIOS PANAYIOTOU

September 17, 2019.

Dear Sir or Madam,

I would like to take a little time of your very busy schedule and introduce myself to you.

My name is Mario Panayiotou and came to the US in 1984 with the intention to go to college. Through many hardships and supporting my family ( 3 children) while in school I managed to achieve my goal. I obtained my BA and then my MA In Political Science. In 1999 I started working with the DOE as a substitute teacher under work authorization visa. As a substitute teacher I had the great opportunity to work in various schools in NYC . I met a lot of students and administrative personnel and at times I was offered a full time position on a yearly base. I finally obtained my Green Card and then the proud moment in my life came when I became a US citizen.

In January of 2012 I went to PS/IS 384 in Brooklyn on a substitute assignment. After 2 weeks of working with them they liked my teaching skills and work ethics and offered me a full time position as Middle School Math Teacher. Finally my life long dream to be a teacher came through. As a full time teacher at PS/IS 384 I was teaching Math, Science and Living Environment. I didn't mind the heavy load of work that was given to me. I love what I do and I also knew that I needed to prove myself during the 3 years that I was on probation. Besides, hard work never scared me. During my 3 years of probation everything was great and I was well liked and respected by students, colleagues and administration. When the 3 year probation time was up I signed a year extension in order to complete my portfolio. I had put that aside for a while because my priority was the students and their learning process.

With the new contract I was supposed to obtain tenure in January of 2016. Few months prior to January 2016 I started inquiring information as to when I should hand in my portfolio and be considered for tenure. I couldn't get any answers from any of the administrators or school pay roll secretary. Finally, I found out that they were in violation of my contract. In my contract stated January 2016 eligible for tenure while in their contract was stating January 2017. When I asked the Principal at the time Ms Phyllis Raulli her answewer was " this is the contract and you need to sign it. "

My chapter leader Mr. Frank Nieves advised me to speak to my union. The union Attorneys advised me not to sign anything because the principal was in violation of my contract and they were trying to hide their error. My union representative along with the district representative Ms Kathy Sarko came to the school and were trying to negotiate my case. The principal didn't want to hear it and was forcing me to sign threatening to fire me. In her words " If you don't sign this new contract right now you wont have a job my Monday and you know I can do it. Then she continued saying " Just sign this contract and I willl give you tenure next year". Unfortunately out of fear of losing my job I signed the new contract. My financial obligations

and my obligation to my family didn't allow me to fight harder. I believed her and took it in good faith that she was keeping her word. To my surprised not only she wasn't keeping her word but she started retaliating against me. Every day I went to work to a stressful and hostile environment. She kept telling me to look for another job and she doesn't want me there anymore. She became rude and disrespectful and refused to give me a computer or school supplies. I was constantly stressed and couldn't focus on my teaching. I couldn't sleep and I couldn't perform at my fullest capacity. I was under enormous stress on a daily base.

Then she started randomly observing me on a frequent base. Up to that point all my evaluations were efficient and all of a sudden I started receiving " Developing" and negative evaluations. It went on for a while but I tried to be patient and do my job to the best of my ability under very difficult circumstances. As we were getting closer to the date that I was eligible for tenure I started inquiring about it, and I was attempting to submit my portfolio for evaluation. Again I was getting no answers.

In November of 2016 I received a letter from Ms Truck the district 32 superintendent . In the letter she stated that instead of obtaining tenure I would be discontinued at the end of my contract in January of 2017. I couldn't believe it. After 17 years with the DOE one person had the power to destroy my life and livelihood. We went to a hearing but the committee voted in favor of the DOE. I hired my own attorney and filed a complain with the State Division of Human Rights. Unfortunately the case was dismissed. Everybody was shutting doors to my face. My career and my reputation as a teacher was ruined. In addition a PR code was next to my name in the system and no other principle was willing to hire me even though I had the necessary qualifications and skills.

I tried to obtain my substitute teaching license again. Another principle gave me a nomination letter but after speaking with Ms Raulli the nominating principle withdrew her nomination. Again Ms Raulli had control over me working and supporting my family. One person was given that much power. To destroy someone's life. All my years of hard work and dedication with the DOE didn't matter. One person decided that everything is to be taken away from me. My paycheck, my benefits, my pension. Everything that I ve worked so hard for. Instead of planning my future and my retirement at age 53 I found myself planning my next paycheck and trying to keep it together for my family. I am the main provider. I have a young adult child with a dissability . My wife with many medical issues and 2 hip replacements was forced to work more so we can keep it together. My entire family got affected by this. I was physically, mentally and emotionally drained.

I was advised to file this Federal Law Suit as a last attempt to get my life back, Family and friends told me is probably a long shot and that no one will care about my story. I refused to believe that. I still believe in the justice system and have faith. All I am asking is for someone to hear my story and give me a chance to talk on my behalf. I am a great teacher and I absolutely love my job. Its not about numbers or legalities. Its about a human life.

I thank you for taking the time to read my letter and I appreciate your support. I still believe in people and I still feel that there are fair and good people out there. I am looking forward to hearing from you.

Sincerely,

Marios Panayiotou

PS : I attached all the paper work from my attorney for you to review.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: **Marios Panayiotou**
**227 Dover Green**
**Staten Island, NY 10312**

From: **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **16G-2018-00734** | **Holly M. Shabazz,** <br> **State & Local Program Manager** | **(212) 336-3643** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Kevin J. Berry,
**District Director**

August 17, 2018

*(Date Mailed)*

Enclosures(s)

cc:
**Attn: Director of Human Resources**
**CITY OF NEW YORK, DEPARTMENT OF EDU**
**Office of Legal Services**
**52 Chambers St., Room 308**
**New York, NY 10007**

# LEEDS BROWN LAW, P.C.

One Old Country Road, Ste. 347
Carle Place, NY 11514
(516) 873-9550

_____Attorneys at Law_____

June 1, 2018

*Via Certified Mail/Return/Receipt/Requested*

Carolyn Downey, Esq.
General Counsel
New York State Division of Human Rights
One Fordham Plaza, 4ᵗʰ Floor
Bronx, New York 10458

      Re:     **Marios Panayiotou v. City of New York, Department of Education**
              **Case No.: 10191371**
              **Federal Charge No.: 16GB800734**

Dear Ms. Downey:

Pursuant to 9 NYCRR § 465.20(b)(1), the Complainant, Marios Panayiotou ("Marios"), submits this letter and attached exhibits as his Motion to Reopen the No Probable Cause determination issued by the New York State Division of Human Rights ("SDHR") in the above-referenced proceeding. The SDHR issued its determination on May 7, 2018 finding that no probable cause exists regarding Marios' claims of discrimination based on sex and retaliation for opposition thereof.

The record appears to be incomplete and does not support a finding of no probable cause. The investigator did not fully consider Marios' rebuttal and the documents submitted by counsel, as well as failed to contact Marios at any point in time to conduct a fact-finding conference. Perhaps of greatest concern, improper comparators were utilized which mischaracterized the treatment of Complainant, which can be established as disparate, and unique to him. Based on the evidence adduced, there was no factual or legal basis for failing to find probable cause.

## PROCEDURAL HISTORY

On November 1, 2017, Marios filed a complaint with the SDHR alleging that he was discriminated against based upon national origin (Greek-Cypriot), age, and retaliation for opposition of discrimination. See **Exhibit "1"**. On January 26, 2018, Respondent submitted a position statement in response to Marios' complaint, as stamped as received by the SDHR on January 10, 2018. Thereafter, Marios filed a rebuttal to Respondent's position statement. See **Exhibit "2"**. On May 7, 2018, the SDHR issued a determination after investigation ("Determination") and found no probable cause. See **Exhibit "3"**.

## THE SDHR'S FLAWED INVESTIGATION

As detailed below, a number of factual and logical errors underpin the finding of no probable cause in this case:

**Respondent asserted that complainant's employment was discontinued for the legitimate, non-discriminatory reason that his work performance was perceived as deficient. According to respondent, after receiving two consecutive overall ratings of "developing", complainant's work performance did not improve.** See Exhibit "3", Page 2.

Respondent's position attempts to argue that Marios, a non-tenured but veteran teacher, was capable of earning the highest possible teaching evaluations during the 2011/12 and 2012/13 School Years, and then was able to adapt to a new rubric for evaluation under the Danielson Framework during 2013/14—his tenure year. Marios was rated as "Effective" during his tenure year. However, instead of granting him tenure, Respondent directed Marios to extend his probationary term. Upon information and belief, this was intended to deny Marios the tenure protections he deserved, and to expose him to future adverse ratings. Marios signed this extension, and then a 2nd extension, under the threat of termination.

**Our investigation failed to substantiate complainant's claim that an Assistant Principal allegedly told complainant that he would be better off teaching in Greece. Furthermore, even if such a comment were made, it would not be sufficient to suggest a causal nexus between complainant's national origin and the discontinuance of complainant's employment approximately one and a half years later. Significantly, it was Principal Raulli, rather than the Assistant Principal, who made the decision to discontinue complainant's employment.** See Exhibit "3", Page 2.

Temporal proximity is established through the first opportunity doctrine. Here, the Respondent was only able to further discriminate and retaliate against Marios until after he'd been forced to extend his probationary term. As the NYSHRL mirrors Title VII, federal courts have found that "[e]specially where a defendant retaliates at the first opportunity that is presented, a plaintiff will not be foreclosed from making out a prima facie case despite a substantial gap in time." See *Pardo Kronemann v. Jackson*, 541 F.Supp.2d 210 (D.D.C. 2008). In this matter, once Marios was forced to extend his probation, his performance evaluations instantaneously got worse, dropping to the lowest levels of his career, and despite three (3) prior years of top-rated and "Effective" performance.

In relation to the decision-making in termination coming from the building Principal Raulli, all employment related decisions are enacted through building level administration directing a matter to the attention of the Superintendent. Assistant Principals act at the direction of their building Principal, and also have the authority to make recommendations concerning personnel. Upon information and belief, the repeated and timely comments by AP Quinci that "cultural differences" were causing Principal Raulli and AP Quinci to "not want [Marios]" give rise to a discriminatory animus, by Marios' administration, and directly during the period in which Marios suffered the adverse actions of 1) unnecessary probation extension, 2) changes to negative performance evaluations, and 3) being threatened with discontinuance until the Union grieved the matter, and 4) being discontinued, and not even simply terminated/allowed to

resign, so that Marios could not work in other DOE schools, causing offers of employment at another school to be pulled.

With regard to the allegation of age discrimination, it is noted that both the Assistant Principal and Principal Raulli are older than complainant. In addition, respondent employs ten teachers at PS/IS 384K who are older than the complainant. Since the 2013-2014 school year, the complainant is the only teacher at the school whose employment was discontinued. See Exhibit "3", Page 2.

This identifies that the investigation, as conducted, improperly assigned comparators to Marios. By their very nature, tenured teachers gain protections that afford due process, essentially putting the burden on the DOE to establish a "for cause" rational basis for termination, and tenured teachers are provided with the right to a hearing pursuant to Section 3020-a of the Education Law, which affords them the right to an arbitrator, counsel, discovery, and cross-examination. Probationary teachers do not get any of these benefits. It is improper to consider a probationary and tenured teacher as comparators.

Marios was the oldest probationary teacher at his school throughout the duration of his employment. He's also the only Greek-Cypriot teacher, probationary or otherwise, at the school during that period. His comparators are other probationary teachers, who as confirmed above, all received tenure and/or were not discontinued. Marios was the oldest, the only Greek-Cypriot, and the only one discontinued, despite having been rated as "Effective" in his tenure year. Thus, evidence supporting a prima facie case of disparate treatment and discrimination exists, meriting a finding of *probable cause*.

## LACK OF A FULL AND PROPER INVESTIGATION

The SDHR failed to conduct a full and fair investigation into the matter. The SDHR investigator assigned to the matter did not contact Marios' counsel at any time regarding the matter. At no point in time did an investigator ask to speak to Marios to conduct a fact-finding conference, nor ask any other questions regarding the matter. No witnesses were requested, nor were any witness interviews conducted. It is our belief that little to no investigation was conducted, but rather a cursory glance at Respondent's documents was made, and a determination was formulated.

## CONCLUSION

A determination of probable cause is not a final adjudication, merely an acknowledgement that there exist factual issues that warrant a formal hearing on the matter. *Bd. of Educ. v. State Div. of Human Rights*, 330 N.Y.S.2d 274 (Sup. Ct. West. Co. 1972). It exists in when, "after giving *full credence* to the complainant's version of the events, there is *some* evidence of unlawful discrimination." *Robertson v. State of New York*, 240 A.D.2d 504 (2d Dept. 1997) (emphasis supplied). As established above, the investigation did not give Marios' version of events full credence, yet there remained evidence of unlawful discrimination and retaliation, meaning that a finding of no probable cause was not proper. Without a hearing, dismissal is proper only if it "appears that virtually as a matter of law the complaint lacks merit." *Id.* Given that there are issues of fact yet to be resolved in Marios' claim, it does not, as a matter of law, lack merit. These issues of fact would best be resolved at a public hearing before an administrative law judge, where testimony is taken, witnesses are subject to cross examination, and a full record is made.

## Restatement of Facts

Marios Panayiotou ("Marios") is a 53-year-old of Greek-Cypriot national origin, having a date of birth of October 29, 1964.

In February 2000, Marios began working for the New York City Department ("the DOE") of Education as a general education teacher, first working at P.S. 73 in Brooklyn, NY, as a 5th grade teacher.

During the 2000/2001 School Year, Marios was assigned to P.S./I.S. 284, where he taught Social Studies to grades 1-5.

Following the 2000/2001 School Year, Marios continued working as a substitute teacher in New York public schools.

Marios enhanced his educational background and teaching abilities by way of receiving a Baccalaureate Degree from Hunter College, a Masters Degree from Brooklyn College, as well as continued Education at the collegiate level throughout the period of 2008/2010.

On January 17, 2012, Marios was hired to work as a teacher at P.S./I.S. 384K, located in Brooklyn, NY, in the Junior High School.

Throughout his tenure at P.S./I.S. 384K, Marios was the oldest teacher in his Junior High School Department, as well as the only Greek-Cypriot.

Throughout his entire tenure at P.S./I.S. 384K, Marios was the only teacher in Junior High who was assigned to teach three (3) different subject matters.

While teaching at P.S./I.S. 384K, Marios served as an instructor in the subjects of Mathematics, Science, Living Environment, 8th Grade Regents, and Mathematics Academic Intervention Services ("AIS").

Marios' probationary term with the DOE was to be complete after 3 years of working, with his eligibility anniversary coming in January 2015, during the 2014/2015 School Year.

During the 2011/2012 School Year, Marios demonstrated effective teaching techniques, receiving the highest possible year-end rating at the time as a "Satisfactory" educator.

During the 2012/2013 School Year, Marios continued to demonstrate effective

teaching techniques, again receiving the highest possible "Satisfactory" rating.

During the 2013/2014 School Year, Marios received an Overall Rating of "Effective" while teaching at P.S./I.S. 384K. This was a very important rating, as it was for the School Year immediately preceding when Marios was eligible for tenure. Upon information and belief, a teacher who is rated as "Effective" is ordinarily granted tenure.

On October 22, 2014, shortly after the beginning of the 2014/2015 School Year, Marios signed a one (1) year extension of his probationary term, which would extend his probationary term until January 2016. Marios signed this extension at the direction of Principal Phyllis Raulli ("Raulli"), who advised him to sign or risk discontinuance. However, Marios had just received back-to-back favorable yearly-evaluations, making him an excellent candidate for tenure.

While at P.S./I.S. 384K, Marios continued to perform favorably—however, he did not receive feedback which reflected his performance.

During the end of the 2014/2015 School Year, in or around June 2015, Assistant Principal ("AP") Philip Quinci ("Quinci") called Marios into his office. AP Quinci told Marios that because of his cultural background, he would have problems with the "culture" of the school, and that "[he] was better off teaching in Greece."

On October 15, 2015, Marios was reviewed by AP Quinci. During this observation, Marios was evaluated in nearly every single component of the Danielson framework. Marios was rated as "4-Highly Effective" in three (3) components, and as "3-Effective" in the remaining six (6) components.

On December 15, 2015, Marios was again reviewed by Assistant Principal Quinci. During this observation, Marios was evaluated in every single component of the Danielson framework. Marios was rated as "4-Highly Effective" in one (1) components, as "3-Effective" in nine (9) components, and received only a single "2-Developing" score. Marios did not receive any score of 1-Ineffective during this observation by Quinci.

Under the leadership of Principal Raulli, Marios has been subjected to targeting and disparate treatment based on his age, as well as his Greek-Cypriot national origin.

Notably, Principal Raulli would tell Marios that he needed to "speak clearly" to his students. Marios believed this to be a reference to his accent, which derives from his Greek-Cypriot national origin.

At the conclusion of the 2015/2016 School Year, two (2) younger teachers in Marios' Department, including Ms. Murname, Ms. Garritano, who are all believed to believed to be in their 20's or early 30's, received tenure. AP Quinci told Marios that the "administration preferred younger teachers, as unfair as that is."

In January 2016, and continuing through the end of the 2016/2017 School Year,

Marios was frequently told by AP Quinci that "the cultural differences are not on your side." Further, Principal Raulli repeatedly told Marios that he "doesn't want [him] there anymore" and to "find another job." This created a hostile work environment for Marios, and further led to his belief that he was being discriminated against based on his national origin.

On January 7, 2016, Union Representative Frank Nieves ("Nieves") attended a meeting with Marios and Principal Raulli, in which Nieves advised Principal Raulli that Marios was contractually to be granted tenure in January 2016, under the terms of his NYSUT-DOE contract.

On January 8, 2016, Principal Raulli informed Marios that he was having his probationary term extended until January 2017.

Around noon on January 8, 2016, Principal Raulli called Marios into his office, and in the presence of Nieves, told Marios that "if you do not sign this extension right now, I will fire you by Monday." Union Representative Nieves immediately contacted New York State United Teachers ("NYSUT") Legal, getting District Representative Kathy Sharko ("Sharko") on the phone. Nieves told Principal Raulli that "Marios has the right to be legally advised by the UFT attorneys before we sign the extension." However, Principal Raulli began shouting at Marios, threatening to fire him unless he signed the extension. Out of fear of being immediately terminated as a probationary employee of the DOE, Marios signed the extension.

On February 8, 2016, Principal Raulli stopped Marios in the hallway, telling him "I am going to fire you."

On April 12, 2016, Principal Raulli called Marios into his office, telling him that Marios was to be excessed. An excessed teacher may find employment with another DOE school.

Mere days later, Principal Raulli called Marios into his office, telling him "I'm not going to excess you, I'm going to discontinue you." A discontinued teacher is terminated from the DOE, and will be coded so that they cannot be hired by any DOE school.

Marios immediately sought to grieve the matter through Union Representative Nieves. Following union action in the matter, Marios was not discontinued during the 2015/2016 School Year.

On June 27, 2016, Principal Raulli called Marios into his office and told him to "try to find another job" and that "I might excess you in January...I'm not sure."

On June 28, 2016, while Marios was standing outside Principal Raulli's office, to pick up paperwork relating to his alleged discontinuance, Marios overheard Principal Raulli tell Assistant Principal Janine Zito ("Zito") "I can't stand him," while gesturing towards Marios.

At the end of the 2015/2016 School Year, Marios contacted Pupil Accountant Jose Bonilla ("Bonilla") concerning when he would receive his new work laptop for the upcoming 2016/2017 School Year. However, Bonilla told Marios that "as per Ms. Raulli, you are not to receive one."

Notably, Marios received an "Effective" overall rating for the 2015/2016 School Year—the year in which he was scheduled to achieve tenure.

On September 6, 2016, which was the first day of the 2016/2017 School Year, Marios was called into Principal Raulli's office, where he immediately said "try to find another job."

On September 8, 2016, when Marios asked Principal Raulli for a laptop, in order to utilize the Smartboard in his classroom, Principal Raulli ignored his request, and instead said "you cannot stay here, you have to find a job."

On September 13, 2016, Marios again informed Principal Raulli that he did not have a laptop, which prevented him from utilizing the Smartboard.

On September 15, 2016, Marios was called into a meeting in Room 114, far away from the main office of Principal Raulli. Principal Raulli, as well as AP Quinci. At no point during the meeting did substantive conversation or development occur concerning Mario's 2016/2017 Teacher Improvement Plan ("TIP"). During 42 of the 45 minutes that the meeting occurred, Marios was berated and told by Raulli and Quinci to leave the school.

Under the ADVANCE guidelines, Marios was supposed to be able to participate in the drafting of his TIP. Instead, no initial TIP meeting was held, denying Marios his contractual rights.

On September 16, 2016, Marios continued to advise Principal Raulli about his lack of a laptop. Notably, every other teacher at the school had received their new laptops on June 27, 2016.

In addition to not issuing Marios a laptop, Marios had made his administration aware of his lack of calculators, markers, or chart paper in his Mathematics class. Upon information and belief, this lack of resources was intended to negatively impact Mario's classroom environment, and impact his classroom evaluations.

On October 6, 2016, Marios was provided with a written observation report concerning his September 19, 2016 classroom observation by Principal Raulli. During the post-observation meeting on September 26, 2016, Principal Raulli had advised Marios that his lesson was "Effective" on the majority of components of the Danielson scoring rubric under the DOE's ADVANCE Observation Report. However, on his written Observation Report, Principal Raulli had applied "Developing" on the majority of Marios' components. When Marios inquired about the reason for this change, Principal Raulli informed him that

he was being marked down because his classroom lacked chart paper. Notably, Marios had repeatedly asked for this resource throughout the start of the School Year.

When Marios complained to Principal Raulli about the lack of supplies impacting his observation, she responded "this is what you get, only the observation report. You should find another school."

Marios was the only teacher who was observed twice in one (1) month, with his first two (2) observations occurring only mere weeks after his first observation and receipt of written feedback. This denied Marios appropriate opportunity to implement feedback, as is required under the evaluation system.

On October 21, 2016, Marios went to Principal Raulli's office, and inquired about his prior emails requesting supplies. Principal Raulli angrily yelled at Marios, saying "why do you keep sending me all of these emails? Are you playing games with me?" He ended the meeting by stating "believe me, you won't be getting another extension." Marios did not get his supplies for another week.

On October 25, 2016, Marios discussed his tenure portfolio with Principal Raulli, telling her that he was "putting his finishing touches on it." In response she said "oh, well, the Superintendent will not approve it anyway. During the meeting, Marios complained that he had received two (2) observations in a single month, and that he had not been afforded feedback under the scope of a TIP. Marios complained to Principal Raulli that this disparate treatment made him "feel like [he] was being targeted." Notably, Marios was the oldest teacher in the Junior High School of P.S./I.S. 384K, and he was the only Greek-Cypriot.

On November 4, 2016, Union Representative Nieves gave Principal Raulli two (2) grievances concerning Marios, with the first being about the lack of feedback under the TIP, and the second concerning Marios' complaints of workplace harassment. Notably, Marios had advised Nieves of his complaints of discrimination on the basis of his age, as well as his Greek-Cypriot national origin. Upon information and belief, Marios' complaints of discrimination were conveyed to Principal Raulli.

On November 7, 2016, Principal Raulli called Marios into his office. She berated him, stating "why are you sending me all of these emails? Now I'm going to start writing things too!" She then told Marios "I showed your lesson plan to my husband, his response was 'what is that?!?'". Marios humiliated and further concerned that his private notes concerning his lesson were being shown by his administration to others, and for the alleged purpose of making fun of him.

On November 10, 2016, Principal Raulli called Marios into his office, and gave him a letter that stated he does not meet the requirements for tenure, and may be discontinued.

Notably, this occurred mere days after 1) Marios brought two (2) grievances concerning his treatment by Principal Raulli, and 2) Marios had submitted his request for

assistance from Principal Raulli in submitting his tenure portfolio.

On November 18, 2016, Marios was issued a Denial of Completion of Probation letter from Principal Raulli, which effectuated his termination from the DOE in sixty (60) days. Upon information and belief, Marios' termination was motivated by his opposition to discrimination, workplace harassment

On January 17, 2017, Marios was terminated by the DOE. He appealed his termination to his District 32 Superintendent, Lillian Druck ("Druck").

On January 24, 2017, even before Marios' appeal hearing was determined, the DOE placed a "PR" code, or problem code, on Marios' employee record. As a result, any principal or superintendent who would want to consider Marios' for employment will automatically be prevented from hiring Marios. Thus, the DOE engaged in actions condemning Marios' potential employment even before his appeal was heard—the decision was already made.

On January 27, 2017, Marios was nominated by Principal Karen Ditolla to be a substitute teacher with the DOE.

On February 28, 2017, Marios was contacted by Kisha Rooks ("Rooks"), who works for the DOE's Office of Personnel Investigations, which performs personnel checks before hirings, that Rooks would be contacting his nominating Principal Ditolla, as well as his former Principal Raulli, to confirm his hiring.

On March 6, 2017, Marios was again contacted by Rooks, who now informed Marios that his job offer was withdrawn. Upon information and belief, Marios' security clearance was denied by Principal Raulli, in further retaliation for his opposition to discrimination.

On May 5, 2017, Superintendent Druck reaffirmed the decision to terminate Marios.

Upon information and belief, Marios' termination was motivated by his age and Greek-Cypriot national origin, as well as in retaliation for his opposition to discrimination and workplace harassment.

## Post-Filing Developments

As a result of the DOE's decision to terminate, he has been adversely coded in such a fashion that he cannot apply for and receive consideration for any DOE positions—he has an automatic bar that prevents building Principals from completing his hiring, even if they want to hire him (as did Principal Karent Ditolla). Thus, he has continued to sustain economic injury related to the DOE's actions in further retaliating against Marios, and subjecting him to denied hiring opportunity.

**Response to Specific Statements in Respondents' Position Statement**

Marios reasserts all claims made in his Verified Complaint submitted to the New York State Division of Human Rights ("DHR") and further clarifies:

> *However, when complainant exhibited performance deficiencies, he received "developing" ratings. Complainant exhibited uneven performance during each school year.*
Page 2, Paragraph 3

This is inaccurate. Marios received frequent inconsistent observation feedback from his administration. In addition, Marios experienced modifications to his lessons, during the actual observations, which are indicative of an intent to cause him additional difficulties in his lesson. As an example, on September 19, 2016, Marios experienced an observation in his classroom, while another teacher, Ms. O'Neil, was placed into his general education Mathematics class. Ms. O'Neil confirms that immediately prior to the lesson, she was told by the administration to take weak students and pull them out for separate instruction. Marios had already submitted a lesson plan to the attention of AP Quinci and Principal Raulli, in which these students, who were removed by Ms. O'Neil, were identified and planned for as Group 1. Immediately before the lesson, this group of students was removed, rendering portions of Marios' lesson plan impossible to produce for the observation. Ms. O'Neal confirms that the administration told her to remove these students immediately before Marios' observation was set to begin. See as attached **Exhibit "TBD"**, October 21, 2016 Letter from Ms. O'Neil. Further, both administrators entered Marios' classroom 10 minutes into the lesson, and missed the introduction to the lesson. However, on his observation report, they then attacked Marios for not using a "Do Now" in his lesson. Marios did in fact perform a "Do Now" at the beginning of his lesson—his administrators missed it, and then penalized Marios with an "Additional Evaluator Notes" that told him to take such action, which influenced his "Developing Rating" on Domain 1e (p&p). See Respondent's Exhibit "T"; page 3 (September 19, 2016 – Observation Report).

> *To support the improvement of complainant's instruction, her received years of targeted support and guidance, including meaningful feedback after each observation, professional literature, a mentor, professional development meetings with AP Quinci, a program of intervisitiation to observe the pedagogical practices of his consistently effective colleagues, the placement of a second teacher in his classroom to assist with his classroom management issues, and the weekly assistance of a middle school instructional specialist. Despite these extensive supports, complainant failed to demonstrate consistently effective pedagogy over the course of a full year.*
Page 2, Paragraph 4

For ease of convenience in review, Marios objects to the false statements offered by the DOE in terms of assistance and feedback as follows:

a) Observation Feedback: Marios received late observation feedback, in violation of his contractual rights under the APPR guidelines. Notable, received late observation feedback at least 4-5 times. For example, during the December 15, 2016 observation, Marios received no feedback until February 3, 2016.

b) Professional Literature: Marios received only the standard materials offered by the DOE. However, and contrast to his comparators, Marios did not receive standard supplies in his classroom. While his co-workers got their computers in June, Marios didn't get a computer until the end of September, and he received it from a co-worker, rather than from the administration. Marios didn't receive pens, chart paper, loose leaf—basic and fundamental materials, until October 21, 2016, months into the school year, and after frequent complaints.

c) Mentor: Marios did not receive a mentor during his final year working at the school, rendering material issues as to the assistance that he received.

d) Professional Development with AP Quincy: This did not take place. Instead, Marios met with AP Quincy only two to three times during the entire TIP year. AP Quincy rarely attended the Professional Development that Marios performed, telling Marios that he was "busy doing other things in the school."

e) Intervisitation: The use of these intervisitations only served to allow the DOE to check a box to allege that they had attempted to provide Marios with assistance. Instead, they should have provided him with basic school supplies, which they failed to do.

f) Placement of a Second Teacher: Marios' second teacher testifies to his capability as an educator. See as attached **Exhibit "TBD"**, June 28, 2016 Letter from Ms. O'Neill.

g) Middle School Education Specialist: These individuals merely came one time a month.

h) Alleged Extensive Supports: Marios was assigned to have three (3) different subject matter classes in each year at PS/IS 384K. Marios being required to teach in such a fashion was a burden which only he shared, and this disparate treatment is indicative of a discriminatory animus.

*A central feature of Advance is frequent classroom observations paired with timely, meaningful feedback and targeted support to help teachers continuously strengthen their instruction.*
Page 2, Paragraph 2

If this was the intention, it was not the reality. Marios received little to no feedback or support.

*To support the improvement of complainant's instruction, he received...the weekly assistance of a middle school instructional specialist.*
Page 2, Paragraph 4

This is false. Marios met with this instructional specialist only three to four times over a period of five to six months. This inconsistent schedule, spaced apart the course of nearly an entire school year, indicates a separation from the truth of the DOE's papers.

*On November 15, 2013, AP Quinci conducted an observation of complainant's class, and observed effective pedagogy in some areas, but multiple pedagogical deficiencies.*
Page 2, Paragraph 5; Respondent's Exhibit "A"

This statement intends to mischaracterize the fact that the majority of this observation was rated as "Effective," and also ignores the context of the class. During this observation, Marios was teaching in Room 702, which was a class in which 1/3rd of students were English as a New Language ("ENL") students, many of whom could not speak English. Marios cannot speak Spanish, and there was tremendous difficulty in communications. The DOE was supposed to assign an ENL teacher who could speak Spanish to Room 702. They did not, and this failure negatively impacted the classroom environment. The remaining 2/3rds of Room 702 was largely comprised of low-functioning students, many of whom had behavioral problems. Notably, when Marios sought assistance from AP Quinci concerning these issues, he was told "Deal with them." Further, when Marios would call AP Quinci's office phone for assistance, Quinci would not answer. Marios would then travel to AP Quinci's office, where he saw Quinci eating and drinking coffee. Marios' claims of lack of support are confirmed through the letter of his colleague Brian Gardner, who states that he witnessed Marios "attempt to contact the administration for student behavioral support, via telephone, on numerous occasions." However, no assistance was provided. See as attached **Exhibit "TBD"**, February 3, 2017 Letter from Mr. Gardner.

Additionally, Rooms 702 and 703 were both assigned to Marios during 2013/14 and 2014/15. When Marios complained about these rooms being assigned students with disciplinary problems and/or ENL status, and asked to teach at least in part in Room 701, Principal Raulli told Marios "This is what you get—if you don't like it, then leave."

*On December 2, 2013, Principal Raulli similarly noted uneven performance during an observation of complainant's class.*
Page 2, Paragraph 6; Respondent's Exhibit "B"

This mischaracterizes the scope of the evaluation, which observed 12 components of the Danielson Framework. Marios was rated as effective in the majority—in fact, in 2/3rds of the components, Marios was "Effective." Again, this was a math class being taught in Room 702, and Marios sought repeated assistance in relation to this class. Despite his efforts, no assistance was provided.

*As complainant had exhibited uneven performance during the 2013-2014 school year, it was appropriate to extend complainant's probationary period.*
Page 3, Paragraph 2.

Marios was exploited by his administration and tricked into signing extension of probation, despite the record of performance establishing that he merited tenure at the time. Frankly, Marios' performance is documented as being "Effective" during the years of his probation extension. See as attached **Exhibit "TBD"**, October 6, 2014 APPR Overall Rating of "Effective". Thus, Marios' probation extension serves to effectuate the future adverse action of discontinuance of his employment with the DOE, when he was ready and capable of earning tenure as "Effective".

*After a December 10, 2014 classroom observation, Principal Raulli rated complainant "developing" for three components, as complainant experienced difficulty in managing student behavior and actively engaging students, asked questions that failed to deepen students' understanding, and failed to provide students with feedback.*
Page 3, Paragraph 3; Respondent's Exhibit "F"

Again, the majority of the components of this observation found that Marios was "Effective," raising issues of credibility as to the DOE's position. Again, the class observed was Room 702, which possessed the same problems, and the same lack of solutions from the administration. Additionally, Marios again had no ENL assistance in this classroom, and further during this school year, Marios was teaching not only Math, but also Science, as well as Living Environment, as well as the Living Environment Regents class. It is illogical that a less-than-effective teacher would be assigned to teach a Regents course. See as attached **Exhibit "TBD"**, June 28, 2016 Letter from Ms. Simidian. See as attached **Exhibit "TBD"**, June 28, 2016 Letter from Ms. O'Neill.

*On March 20, 2015, AP Quinci observed complainants class and noted various areas still in need of improvement.*
Page 3, Paragraph 4; Respondent's Exhibit "G"

During this period of time, Marios was fully engaged in the additional roles he was assigned concerning the Regents examinations, in addition to the three classes he was already teaching. Notably, Marios' comparator teachers were only teaching one subject— here, he was teaching three. When Marios complained about teaching three subjects, which was the most of his comparator teachers, his administration told him that they also wanted him to teach afterschool Learning Environment Regents, as well as afterschool Math Regents prep courses. Marios took on these positions, and the vast majority of his students passed the Living Environment Regents. While one would think that this service would lead to tenure, Marios was again illogically denied tenure, and again coerced to sign an extension of probation, despite again being rated as "Effective" for the 2014/15 School Year.

*Quinci provided complainant with specific guidance and directed him to review the mathematics lesson plans in the Common Core library to improve his performance.*
Page 3, Paragraph 5; Page 4 Paragraph 0; Respondent's Exhibit "H"

Marios denies this action ever taking place.

*On June 2, 2015, AP Quinci conducted an informal observation of complainant's class, noted the improvements in pedagogy, and rated him accordingly. Complainant was rated "effective" for nine components, and "highly effective" for two components.*
Page 4 Paragraph 1; Respondent's Exhibit "I"

Here, Marios was being reviewed without having the additional burden of working the afterschool Regents preps. Instead, he had a fair amount of time to prepare, and thus, his performance accurately reflected his abilities. Further, it is illogical to find that Marios' performance could fluctuate so greatly in such a short period of time, and additionally, this "Effective" observation is better represented by the "Effective" overall observations that Marios had received during the prior 2 school years.

*Complainant received an overall rating of "Developing" for the 2014-2015 school year.*
Page 4 Paragraph 2; Respondent's Exhibit "J"

Respondents argue that Marios' students failed to perform, and that this student performance issue was the direct cause of his rating. While Marios' students performed at an above-average level on their Living Environment Regents examination, it was discounted by his administration. Additionally, the State measurement that is being offered by the DOE in Exhibit "J" does not directly correlate to the performance of Marios' individual students, so it is misleading in its characterization of holding itself out as a performance indicator of Marios. This instead reflects on school-wide performance.

*Complainant also received a TIP for the 2015-2016 school year to provide him with further support.*
Page 4 Paragraph 4; Respondent's Exhibit "L"

This mischaracterizes the "support" that Marios received. Instead, Marios had no regular meetings with his administration, but rather, he met only 2-3 times during the entire school year. Notably, the DOE provides an unsigned TIP. This is because there are specific TIP requirements under the ADVANCE guidelines, and failure to provide for a TIP on scheduled meetings will render a grievable offense. It is also due to the fact that during the first observation of this TIP school year in 2015-2016, Marios performed at an "effective" and "highly effective" rate in nine components. It is illogical to believe that Marios could produce on such a level, while under the microscope of a TIP, and not perform at a similar level while outside of TIP monitoring. Further, Marios was allegedly deficient in student management. However, this again raises the issue of Marios' frequent requests for aid, and the administrations failures to provide assistance, as documented by Marios' own colleagues. See as attached **Exhibit "TBD"**, February 3, 2017 Letter from Mr. Gardner.

*On December 16, 2015,...AP Quinci still found deficiencies in complainant's questioning and discussion techniques, which resulted in a "developing" rating for this component.*
Page 5 Paragraph 1; Respondent's Exhibit "N"

Marios received nine (9) effective components in this observation. He also received an additional "Highly Effective" component. This was a great lesson, as observed, and reflects favorably on Marios as an educator. Instead, Marios was terminated the next year.

*On May 11, 2016,...AP Quinci expressed concern that complainant seemed unable to consistently provide effective lessons.*
Page 5 Paragraph 3; Respondent's Exhibit "P"

This is mere pretext. At the review meeting for this lesson, Marios was advised that his administration was planning to discontinue him.

*Contrary to complainant's allegations, the record shows that he received and acknowledged an overall rating of "developing"—not "effective"—for the 2015-2016 school year.*
Page 5 Paragraph 5; Respondent's Exhibit "R"

Respondent's Exhibit "R" requires a finding of "probable cause" in this matter. Marios' Measure of Teacher Practice ("MOTP") shows that he was rated at "Effective." This is the only component of the APPR for 2015-2016 that reflects on Marios individually. They can't even deny that he was rated as an "Effective" individual educator. Instead, Respondent's mischaracterize an overall "Developing" rating, and fail to tell the NYSDHR that due to negotiation with the teacher's union, they had to eliminate the State measures for this school year, and that the Local Measures reflect on the school, which although it includes Marios, is a reflection on the school and administration. Marios was literally rated as an "Effective" teacher during the 2015-2016 school year. See Respondent's Exhibit "R".

*Principal Raulli informed complainant that, in order to avoid discontinuance, he needed to demonstrate consistently effective performance at the start of the school year and submit a tenure portfolio providing supporting documentation of his effective pedagogy.*
Page 5 Paragraph 6; Page 6 Paragraph 0

Not only did this conversation never happen, Marios did in fact submit a tenure portfolio. However, Principal Raulli had already repeatedly threatened Marios, and

*On September 15, 2016, complainant received an updated TIP for the 2016-2017 school year....*
Page 6 Paragraph 1; Respondent's Exhibit "S"

This meeting failed to comply with TIP requirements. Not only did the administration fail to involve Marios in the interactive process of TIP development, they

used this meeting to intimidate and harass Marios. In the meeting, instead of going over the TIP, Principal Raulli shouted "Find another school—or else!" Marios did not receive an actual TIP meeting until after he was discontinued. Essentially, they went through the motions on December 9, 2016, in an effort to prevent a grievance. However, the decision to discontinue was already made. Marios made contemporaneous complaints about this bogus TIP meeting. See as attached **Exhibit "TBD"**, October 9, 2016 Email to Principal Raulli. As per Marios union, his administration had already told him he was discontinued six months before, at the conclusion of the 2014-2015 school year. See as attached **Exhibit "TBD"**, December 13, 2016 Letter from Mr. Nieves.

> *As of October 17, 2016, complainant had not submitted any lesson plans to AP Quinci pursuant to his TIP, and had not met with AP Quinci to schedule lesson plan review dates.*
Page 6 Paragraph 3; Respondent's Exhibit "U"

Marios didn't even receive his TIP papers until October 18, 2016. The documents presented show that this is a false statement, intended to mischaracterize the facts. See as attached **Exhibit "TBD"**, October 17, 2016 TIP Letter. See as attached **Exhibit "TBD"**, October 18, 2016 Signed Tip Document from Complainant. Additionally, during October 2016, Marios was the only teacher in the school who was had two (2) observations conducted. This disparate treatment is indicative of a desire to quickly build a case for Marios' discontinuance, so that Marios would not receive tenure by estoppel—if they didn't get rid of him fast enough, he'd have tenure and due process rights.

> *Complainant met the same day with Principal Raulli to discuss his performance and the status of his tenure portfolio. He did not allege any type of discrimination.*
Page 6 Paragraph 5

This is inaccurate. Marios did oppose discrimination on October 25, 2016, and thus, his discontinuance serves as a retaliatory action.

## RESPONDENTS DISCRIMINATED AGAINST MARIOS

To establish a prima facie case of discrimination, an employee must show: (1) that he belonged to a protected class; (2) that he was qualified for the position; (3) that he was subject to an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001).

*1.     Marios is a member of protected classes*

Marios is a member of a protected class based both on his age (53), as well as his national origin (Greek-Cypriot).

*2.     Marios is qualified for his position*

Marios must establish that he was qualified for the position, which requires a showing that he held the basic skills necessary for performance of the job. Miller v. Nat'l Ass'n of Securities Dealers, 703 F. Supp. 2d 230, 244 (E.D.N.Y. 2010). Marios was clearly qualified for his position, as evidenced by his tenure with Respondents spanning almost 27 years, and as documented by his observations and recommendations by his prior Supervisors.

3.  *Marios suffered an adverse employment action*

Marios's burden to establish an adverse employment action element is minimal. Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997); see also Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995) (holding that plaintiff's burden in establishing the elements of a *prima facia* case is *de minimis*). An employment action, for the purposes of a *prima facie* case of discrimination, is considered adverse if it "works a 'materially adverse change in the terms and conditions of employment.'" Gregory v. Daly, 243 F.3d 687, 701 (2d Cir. 2001) (quoting Richardson v. New York State Dep't of Corr. Servs., 180 F.3d 426, 446 (2d Cir. 1999)). The Supreme Court has indicated that an adverse employment practice can also include "indices that might be unique to a particular situation." Burlington Inds. v. Ellerth, 524 U.S. 742, 761 (1998) (quoting Crady v. Liberty Nat. Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993).

The Second Circuit has more recently articulated a "totality of the circumstances" test for situations that fall outside of the "classic" adverse employment actions. Phillips v. Bowen, 278 F.3d 103 (2d Cir. 2002). A "combination of seemingly minor incidents" are enough to establish an adverse employment action, if the incidents "reach a critical mass." Early v. Wyeth Pharms., Inc., 603 F. Supp. 2d 556, 574 (S.D.N.Y. 2009) (quoting Phillips, 278 F.3d at 109). In Phillips, the Court held that a series of "lesser actions" may also meet the adversity threshold if a plaintiff can show: "(1) using an objective standard; (2) the total circumstances of [the plaintiff's] working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." Phillips, 278 F.3d at 109.

Marios suffered numerous adverse actions, including:

- Adverse ratings inconsistent with his prior reviews, and further inconsistent with contemporary reviews by his administration

- Ignoring requests for assistance in scheduling, the provision of school supplies, total number of classes, total number of different courses, additional afterschool activities

- Aggressive and threatening behavior from Principal Raulli i.e. screaming at and intimidating Marios, in the presence of his colleagues.

- Open threats by Raulli to discontinue Marios, prior to him ever having been negatively rated as an educator

This conduct constituted a workplace that was "unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace," and thus also qualify as adverse actions under the discrimination standard. Phillips, 278 F.3d at 109. At a minimum, it is an issue of fact as to whether the totality of those acts can amount to an adverse action. As such, this matter merits consideration by an Administrative Law Judge at public hearing.

### 4. These adverse employment actions took place under circumstances giving rise to an inference of discrimination

The ultimate question in a discrimination case is whether there is evidence from which it can reasonably be inferred that complainant's status in a protected class "played a motivating role in, or contributed to, the employer's decision" to take a particular employment action. Renz v. Grey Advertising, Inc., 135 F.3d 217, 222 (2d Cir. 1997); Stratton v. Dept. for the Aging for the City of New York, 132 F.3d 869, 879 (2d Cir. 1997). Direct evidence proving whether complainant's protected class is a motivating factor in an employment action is difficult to find because those who discriminate deliberately try to conceal their discriminatory intent. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). Moreover, discriminatory intent will rarely be demonstrated by "smoking gun" proof. Rather, in most discrimination cases direct evidence of the employer's motivation is unavailable. Dister v. Continental Group, Inc., 859 F.2d 1108, 1112 (2d Cir. 1988). Accordingly, the complainant need not allege direct evidence to demonstrate that gender was a motivating factor in adverse employment actions. See McDonnell Douglas, 411 U.S. at 802; Maresco v. Evans Chemetics, 964 F.2d 106, 110 (2d Cir. 1992). A discriminatory motive may be shown by alleging that preferential treatment was given to employees outside of the complainant's protected class. Abdu Brinson v. Delta Airlines, Inc., 239 F.3d 456, 468 (2d Cir. 2001).

Moreover, the administration subjected Marios to disparate treatment based on his age and Greek-Cypriot national origin, by assigning him a schedule containing a disparate number and variety of courses, and treating him with outward hostility and aggression. Marios's younger and non-Greek-Cypriot co-workers were not similarly forced to work in an offensive and contentious workplace.

## RESPONDENTS RETALIATED AGAINST MARIOS

To establish a *prima facie* case of retaliation, Marios must establish that he participated in a protected activity of which Respondents were aware and that he suffered an adverse employment action because of his participation in this protected activity. Kessler v. Westchester County Dep't of Social Servs., 461 F.3d 199, 205-206 (2d Cir. 2006).

### 1. Marios participated in a protected activity

Marios complained about discrimination on October 15, 2016, and did so again on October 25, 2016.

### 2. *Marios suffered an adverse employment action*

To establish an adverse employment action in the context of retaliation, the plaintiff must show that the conduct in question "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).

Here, after complaining to Principal Raulli disparate treatment, and his continued complaints to and about the administration, Marios was negatively rated without appropriate justification, was forced to extend his probationary term without cause, and was discontinued from his employment.

Furthermore, based on the Respondent's discontinuance, Marios was denied employment by DOE principals who actually wanted to hire him. These are all actions that would dissuade a reasonable worker from complaining about discrimination.

### 3. *This adverse employment action was due, in part, to his participation in this protected activity*

Causation may be shown by the temporal proximity between participation in a protected activity and the adverse employment action. Ashok v. Barnhart, 289 F.Supp 2d 305, 315 (E.D.N.Y. 2003); *see* Lindner v. New York City Bd. of Educ., 2005 WL 1801648 (E.D.N.Y. 2005). However, as the 2nd Circuit has explained, the "time frame establish a causal connection between protected activity and an alleged retaliatory act is not a bright line rule if there is a reasonable explanation in the record for the time gap." Zhengfang Liang v. Café Spice SB, Inc, 911 F. Supp. 2d 184, 212 (E.D.N.Y. 2012). The temporal proximity between Marios's complaints in October 2016, and his worst rating of his career, and then his discontinuance in January 2017, are indicative that a discriminatory and/or retaliatory animus motivated this action.

### 4. *Respondents cannot demonstrate a nondiscriminatory reason for the adverse employment actions*

Once a plaintiff establishes a *prima facie* case, the burden shifting analysis set forth in McDonnell Douglas Corp. v. Green applies, and "the burden then shifts to the employer to articulate some legitimate nondiscriminatory reason for the alleged acts of reprisal." Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir. 1980). If the employer is able to offer a legitimate explanation, then the plaintiff is "given an opportunity to demonstrate that the employer's reasons are a mere pretext for discrimination taken in retaliation for participation in protected activities." *Id.* If one of the reasons that the respondent puts forth for discharging an employee is "false, misleading, or incomplete," it can be inferred that the actual reason for discharge is discriminatory. Cf. Bennett v. Health Management Systems, Inc., 2011 WL 6347918, at 9 (N.Y.A.D. 1st Dept.) (when even one of a

defendant's reasons is false, misleading, or incomplete, summary judgment is improper and only a jury can determine discrimination.

When credence is given to the complainant's version of the facts, and there is some evidence that discrimination exists, a finding of probable cause is proper. Mariosson v. State of New York, 240 A.D.2d 504 (2d Dep't 1997). Accordingly, there exists an inference that Respondents actual reasons for adversely acting in regard to Marios' employment are discriminatory. The lack of supporting evidence and incongruity in the assessment of Marios by his administration indicates a continued animus and retaliatory intent by the administration. In evaluation of the Measures of Teacher Practice, which determines the capability of a teacher in their classroom, Marios was always rated as "Effective."

## CONCLUSION

Based on the foregoing, Marios was subjected to discrimination based on his age and national origin. It is for the above-mentioned reasons, and any other information inferred from Marios' complaint and/or Respondent's defense that it is respectfully requested that the DHR find probable cause on behalf of the charging party so that any remaining material issues of fact and credibility may be resolved by an administrative law judge at a public hearing.